# Exhibit 18

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

| | Case No.: 2:17-cv-11492 (GAD/SDD) |
|---|---|
| DARCEL KEYES, | |
| *Plaintiff,* | **WRITTEN REPORT OF JEFFREY A. HANSEN** |
| *v.* | |
| OCWEN LOAN SERVICING, LLC, | |
| *Defendant.* | |

1

## EXPERT REPORT OF JEFFREY A. HANSEN

2      1.    My name is Jeffrey A. Hansen. I am an adult over the age of 18, a resident

3  of the state of California, and I reside at 2625 Kings View Circle, Spring Valley, CA

4  91977. Unless indicated otherwise, I have personal knowledge of each of the matters

5  stated herein, and if called to testify I could and would testify competently about them.

6      2.    I was asked to prepare this written expert report by Plaintiff's counsel in

7  the above-captioned matter, Hyde & Swigart, in support of Plaintiff's Designation of

8  Expert Witnesses.

9      *3.*    I have been retained in this case at a rate of $300 per hour, for all services

10  rendered, and $380 per hour for depositions.

11  ***Experience and Credentials.***

12      4.    I am the principal of Hansen Legal Technologies, Inc. My firm is in the

13  business of handling Information Technology, including investigations and analysis of

14  electronic data. I have served as an expert or consultant in more than 150 TCPA class

15  action lawsuits, and as an expert or consultant in hundreds other civil cases.

16      5.    With regard to my experience as an expert and consultant in legal matters,

17  generally, I have frequently served as an expert witness and consultant to law firms in

18  conducting computer forensic analysis. I have also assisted in electronic discovery

19  issues.

20      6.    Specific to this case, my firm was retained to assist Plaintiff's counsel in

21  evaluating and analyzing the telephone dialing systems used by Defendant Ocwen Loan

22  Servicing, LLC ("Ocwen") in placing telephone calls to Plaintiff.  I have also been

23  retained to assist Plaintiff and her counsel in evaluating and analyzing electronic data

24  related to the calls and other electronic data associated with computer systems and/or

25  telephone dialing systems used by Ocwen. In that respect, I have extensive experience

26  with data warehousing, including data warehousing related to telemarketing and

27  autodialers in general. I am familiar with the procedures involved in such practices, and

28  I have personally engaged in data warehousing regarding the compilation of certain

2

1   lists, including demographic and target audience lists for telemarketing, and have
2   personally repaired defective lists to eliminate improperly formatted and corrupted data.

3          7.     I also frequently act as a consultant to companies that engage in the use of
4   autodialers, and I am familiar with their use and procedures, and the technical aspects of
5   that business. In that capacity, I have assembled, configured, maintained, operated all
6   aspects of autodialers, and interfaced with the telecommunications providers through
7   whose networks the autodialers operate.

8          8.     I have set up and maintained all aspects of predictive dialers and
9   autodialers, from predictive dialers operating with just three telephone lines to outbound
10  call centers, run from three locations, capable of generating over 1 million calls per
11  hour. When building these systems, I have used various software and hardware
12  solutions for predictive and autodialers, both proprietary and open source, and
13  customized those systems for their particular uses. I myself have used and maintained
14  predictive and autodialers, and trained others to do the same.

15         9.     Further, I am familiar with the manner in which outbound dial lists are
16  used and maintained in the industry in which Ocwen operates. Similarly, I am familiar
17  and have experience with, and know how to use, databases containing cell block
18  identifiers and ported number lists, both of which identify cellular type telephone
19  numbers and are typically used in these industries.

20        10.     Over the last twenty-nine (29) years, I have also had extensive experience
21  in a broad range of other areas in the electronic and information technology fields and
22  obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA,
23  MCSE, Linux+, I-Net+, Security+, CIW Security Analyst.  From the hardware
24  perspective, I have extensive experience in troubleshooting and repairing at the
25  component level, and building various systems for various purposes. I have designed,
26  built and maintained computer networks in a variety of environments from commercial
27  businesses to very large DoD networks. I have taught approximately 1,000 others the
28  skills to become computer network engineers themselves.

3

11.    I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches.  I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-Discovery firm over 9 years ago.  I have also had extensive experience with the set-up and use of predictive and autodialers. (*See Exhibit A – Resume of Jeffrey A. Hansen*).

12.    I have been called to testify in the following civil matters: *Craig Casey v. Valley Center Insurance Agency Inc*., Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple v. QC Holdings, Inc*., Case No. 12-CV-1997-CAB-WVG (S.D. Cal.); *Hahn v. Massage Envy Franchisin*g, Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.); *Abdeljalil v. General Electric Capital Corporatio*n, Case No: 12-cv-02078-JAH-MDD (S.D. Cal.); *Jasminda Webb v. Healthcare Revenue Recovery Group, LLC* Case No: C 13-0737 JD (N.D. Cal.); *Balschmiter v TD Auto Finance, LLC*, Case No: 2:13-cv-01186 (E.D. Wisc.)*; Jordan Marks v Crunch San Diego, LLC*, Case No. 14-CV-0348-BAS (BLM) (S.D. Cal.); *Peter Olney v Job.com,* Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.); *Carlos Guarisma v ADCAHB Medical Coverages, Inc. and Blue Cross and Blue Shield of Florida, Inc*., Case No: 1:13-cv-21016-JLK (S.D. Fla.); *Farid Mashiri v Ocwen Loan Servicing, LLC*, Case No: 3:12-cv-02838 (S.D. Cal.); *Monty J. Booth, Attorney at Law, P.S. v Appstack, Inc*., Case No. 2:13-cv-01533-JLR (W.D. Wash.); *Rinky Dink, Inc. d/b/a Pet Stop v World Business Lenders, LLC*, Case No. 2:14-cv-00268-JCC (W.D. Wash.); *Michael Reid and Dave Vacarro v. I.C. Systems, In*c., Case No. 2:12-cv-02661-ROS (D. Ariz.); *Jeffrey Molar v NCO Financial System*s Case No. 3:13-cv-00131-BAS-JLB (S.D. Cal.); *Latonya Simms v Simply Fashion Stores LTD, and ExactTarget, Inc*., Case No. 1:14-CV-00737-WTL-DKL (D. Ind.); *Sueann Swaney v Regions Bank*, Case No. CV-13-RRA-0544-S (N.D. Ala.); *Hooker v SiriusXM*, Case No. 4:13-cv-00003 (AWA) (E.D. Va.); *Diana Mey v Frontier Communications*, Case No. 13-cv-01191-RNC (D. Conn.); *Rachel Johnson v Yahoo! Zenaida Calderin v Yahoo!*

4

*Cas*e No. 14-cv-2028 14-cv-2753 (N.D. IL); *Philip Charvat v Elizabeth Valente*, Case No. 12-cv-5746 (N.D. IL); *Robert Zani v Rite Aid Hdqtrs. Cor*p., Case No. 14-cv-9701(AJN)(RLE)(S.D. NY), *A.D. v Credit One Ban*k Case No. 1:14-cv-10106 (N.D. IL); *Oerge Stoba, and Daphne Stoba v Saveology.com, LLC, Elephant Group, Inc.; Time Warner Cable, Inc*., Case No. 13-cv-2925-BAS-NLS (S.D. Cal.); *Shyriaa Henderson v United Student Aid Funds, Inc*. Case Number: 3:13-cv-1845-L-BLM (S.D. Cal.); *Marciano v Fairwinds Financial Service*s Case No. 6:15-CV-1907-ORL-41 KRS (M.D. Fla); *Alice Lee v Global Tel\*Link Corporatio*n, Case No. 2:15-cv-02495-ODW-PLA [consolidated with 2:15-cv-03464-ODW-PLA (C.D. Cal.); *Alan Brinker v Normandin'*s, Case No. 5:14-cv-03007-EJD-HRL (N.D. Cal*.); Spencer Ung v Universal Acceptance Corporation,* Case No. 15cv127 RHK/FLN (D. Minn*); Seana Goodson v Designed Receivable Solutions,* Case No. 2:15-cv-03308-MMM-JPR (C.D. Cal); *Dominguez v Yahoo!, In*c., Case No. 2:13-cv-01887 (E.D. Penn); *Eli Ashkenazi v Bloomingdales, Inc*., Case No. 3:15-cv-02705-PGS-DEA (D. N.J.); *Abante Rooter and Plumbing, Inc. v Birch Communications, Inc*. Case No. 1:15-cv-03562 (N.D. GA); *Roark v Credit One Bank*, Case No. 0:16-cv-00173-RHK-FLN (D.Minn); *Carl Lowe And Kearby Kaiser v CVS Pharmacy, Inc., Minuteclinic, LLC, and West Corporation*, Case No. 1:14-cv-03687 (N.D. Ill); *Zaklit v Nationstar Mortgage, LLC*., Case No. 5:15-CV-02190-CAS-KK (C.D. Cal); *Charles Banks v Conn Appliance, Inc*., Case No. 01-16-0001-0736 (American Arbitration Association); *Rajesh Verma v Memorial Healthcare Group*, Case No. 3:16-CV-00427-HLA-JRK (M.D. Fla); *Herrick v Godaddy.com*, Case No. 2:16-cv-00254-DJH (D.AZ); *In Re: Monitronics International, Inc., Telephone Consumer Protection Act Litigation*, Case No. 1:13-md-02493-IMK-JSK (N.D.W.V.); *Diana Mey v Ventura Data*, LLC And Public Opinion Strategies, Case No. 5:14-CV-123 (N.D.W.V.); *Lucero v Conn Appliances*, Case No. 01-16-0004-7141 (American Arbitration Association); *Dennis v Progressive Leasing*, Case No. 01-16-0002-8798 (American Arbitration Association – Final Hearing); *Shani Marcus and Frieda Esses Ashkenazi v CVS Pharmacy, Inc*., Case No.: 3:15-cv-259 PGS-LHG (D. N.J.); *Donnell*

*Webster v Conn Appliances, Inc*., Case No.: 01-16-0003-3774 (American Arbitration Association - Final Hearing); *Snyder v Ocwen Loan Servicing*, Case No.: 1:14-cv-08461 (N.D. Ill); *Shamara Abrahams v First Premier Bank*, Case No. 01-16-0003-8128 (American Arbitration Association - Final Hearing); *Wooten v Conn Appliances, Inc*., Case No.: 01-16-0003-5557 (American Arbitration Association – Final Hearing); *SANDRA WEST AND HECTOR MEMBRENO v CALIFORNIA SERICE BUREAU*, Case No.: 4:16-cv-03124-YGR (N.D. Cal.); *Summers v Conn Appliances*, Case No.: 01-16-0004-1183 (American Arbitration Association - Final Hearing); *Sheena Raffin v Medicredit*, Case No.: 2:15-cv-04912-GHK (C.D. Cal); *Verina Freeman and Valecea Diggs v Wilshire Commercial Capital*, Case No.: 2:15-cv-01428-WBS-AC (E.D. Cal); *Tomeo v Citigroup*, Case No.: 1:13-cv-04046 (N.D. Ill); *Douglas Jurist v Receivables Performance Management, LLC*, Case Number 1240022589 (JAMS ARBITRATION); *April Turner v Credit One Bank, N.A.*, Case No. 1440005239 (Arbitration Tribunals of JAMS - Final Hearing); *Frederick Luster and Narval Mangal v Green Tree Serivicing. LLC*, Case No. 1:14-cv-01763-ELR (N.D. Georgia); *Jonathan Greisen v Credit One Bank* (JAMS Arbitration); *Isaac Saucedo v Credit One Bank* (JAMS Arbitration); *Naomi Blocker v Credit One Bank* (JAMS Arbitration); *Winston Edwards III v Credit One Bank*, Case No. 1260004354 (JAMS Arbitration); *Timothy Levis Johnson v Credit One Bank* (JAMS Arbitraion); *William Boden and Debra Boden v Credit One Bank*, Case Nos: 1220054604/1220054605 (JAMS Arbitration – Final Hearing); *Rebecca Sanders v Credit One Bank*, Case No.: 01-17-0001-6599 (American Arbitration Association - Final Hearing); *Donna Ace v. Credit One Bank* (JAMS Arbitration); *Lynette Alomar v. Credit One Bank* (JAMS Arbitration); *Tonya Anderson v. Credit One Bank* (JAMS Arbitration); *Gregory Andrews v. Credit One Bank* (JAMS Arbitration); *Alyce Baker v. Credit One Bank* (JAMS Arbitration); Terry Bardwell v. Credit One Bank (JAMS Arbitration); *Joshua Bare v. Credit One Bank* (JAMS Arbitration); *Lori Bason v. Credit One Bank* (JAMS Arbitration); *Christopher Batch v. Credit One* (JAMS Arbitration); *Tiffany Battle v. Credit One* (JAMS Arbitration); *Jean Bellingrodt*

*v. Credit One Bank* (JAMS Arbitration); *Carolyn Bennett v. Credit One Bank* (JAMS Arbitration); *Shady Bennett v. Credit One Bank* (JAMS Arbitration); *Kelly Benson v. Credit One Bank* (JAMS Arbitration); *Dawn Berkey v. Credit One Bank* (JAMS Arbitration); *Sherry Best v. Credit One Bank* (JAMS Arbitration); *Daniel Blashack v. Credit One* (JAMS Arbitration); *Edith Blashack vs. Credit One* (JAMS Arbitration); *Takia Brandon v. Credit One* (JAMS Arbitration); *Jeffrey Brown v. Credit One Bank* (JAMS Arbitration); *Karen Brown v. Credit One* (JAMS Arbitration); *Rebecca Burt v. Credit One Bank* (JAMS Arbitration); *Jennifer Burton v. Credit One Bank* (JAMS Arbitration); *Janice Bushey v. Credit One Bank* (JAMS Arbitration); *Matthew Byers v. Credit One Bank* (JAMS Arbitration); *Darrell Byrom v. Credit One Bank* (JAMS Arbitration); *Eric Carlstedt v. Credit One Bank* (JAMS Arbitration); *Ronald Carnes v. Credit One Bank* (JAMS Arbitration); *Michelle Carter v. Credit One Bank* (JAMS Arbitration); *Brandon Chapman v. Credit One Bank* (JAMS Arbitration); *Derek Chism v. Credit One Bank* (JAMS Arbitration); *Bernard Combs v. Credit One Bank* (JAMS Arbitration); *Linda Cooper v. Credit One Bank* (JAMS Arbitration); *Janice Crenshaw v. Credit One Bank* (JAMS Arbitration); *Christopher Crisona v. Credit One Bank* (JAMS Arbitration); *Brent Crompton v. Credit One Bank* (JAMS Arbitration); *Teresa Cruz v. Credit One Bank* (JAMS Arbitration); Lisa Currey v. Credit One Bank (JAMS Arbitration); *Kenneth Curtis v. Credit One Bank* (JAMS Arbitration); *Melissa Damron v. Credit One Bank* (JAMS Arbitration); *Mike Dane v. Credit One Bank* (JAMS Arbitration); *Ayanna Davis v. Credit One Bank* (JAMS Arbitration); *Bruce Davis v. Credit One Bank* (JAMS Arbitration); *Matthew Day v. Credit One Bank* (JAMS Arbitration); *Angela Deal v. Credit One Bank* (JAMS Arbitration); *Bettina Deleon v. Credit One Bank* (JAMS Arbitration); *Nathaniel and Rowena Depano v. Credit One Bank* (JAMS Arbitration); *Melissa Dibenedetto v. Credit One Bank* (JAMS Arbitration); *Juan Dillon v. Credit One Bank* (JAMS Arbitration); *Sarah Peacock v. Credit One Bank* (JAMS Arbitration); *Kristina Dorffer v. Credit One Bank* (JAMS Arbitration); *Michael Dorsey v. Credit One Bank* (JAMS Arbitration); *Dacia Drury v.*

*Credit One Bank* (JAMS Arbitration); *Kelly Dubel v. Credit One Bank* (JAMS Arbitration); *Winston Edwards III v. Credit One Bank* (JAMS Arbitration); *Kristi Evans v. Credit One Bank* (JAMS Arbitration); *Herby Fequiere v. Credit One Bank* (JAMS Arbitration); *Patrick Fitch v. Credit One Bank* (JAMS Arbitration); *Sharon Flowers v. Credit One Bank* (JAMS Arbitration); *Michelle Fong v. Credit One Bank* (JAMS Arbitration); *Joy Williams Frazier v. Credit One Bank* (JAMS Arbitration); *Carol Galanos v. Credit One Bank* (JAMS Arbitration); *Lizette Garcia v. Credit One Bank* (JAMS Arbitration*); Olivia Garcia v. Credit One Bank* (JAMS Arbitration); *Corey Gill v. Credit One Bank* (JAMS Arbitration); *Amy Goetting v. Credit One Bank* (JAMS Arbitration); *Angel Gomez v. Credit One Bank* (JAMS Arbitration); *Derik Gonzalez v. Credit One Bank* (JAMS Arbitration); *Moises Govea v. Credit One Bank* (JAMS Arbitration); *Tonya Greer v. Credit One Bank* (JAMS Arbitration); *Melissa Grose v. Credit One Bank* (JAMS Arbitration); *Laurie Guerrattaz v. Credit One Bank* (JAMS Arbitration); *Scott Guntle v. Credit One Bank* (JAMS Arbitration); *Arlinda Hairston v. Credit One Bank* (JAMS Arbitration); *Bartley Harper v. Credit One Bank* (JAMS Arbitration); *Terrance Harris v. Credit One Bank* (JAMS Arbitration); *Cindy Hawkins v. Credit One Bank* (JAMS Arbitration); *Daniel Hawkins v. Credit One Bank* (JAMS Arbitration); *Tara Hicks v. Credit One Bank* (JAMS Arbitration); *Theresa Hill v. Credit One Bank* (JAMS Arbitration); *Troy and Tammy Hill v. Credit One Bank* (JAMS Arbitration); *Gary and Angela Hlavacek v. Credit One Bank* (JAMS Arbitration); *Virginia Hubbell v. Credit One Bank* (JAMS Arbitration); *Ashley Jackson v. Credit One Bank*(JAMS Arbitration); *Joseph James v. Credit One Bank* (JAMS Arbitration); *Donald Johnson v. Credit One Bank* (JAMS Arbitration); *Janet Johnson v. Credit One Bank* (JAMS Arbitration); *John Johnson v. Credit One Bank* (JAMS Arbitration); *Sonya Johnson v. Credit One Bank* (JAMS Arbitration); *Stephanie Johnson v. Credit One Bank* (JAMS Arbitration); *Kenneth Jones v. Credit One Bank* (JAMS Arbitration); *Michael and Marianne Jordan v. Credit One Bank* (JAMS Arbitration); *Robert Ketterman v. Credit One Bank* (JAMS Arbitration); *Leila Kier v. Credit One Bank*

1    (JAMS Arbitration); *Samantha King v. Credit One Bank* (JAMS Arbitration); *Jessica*

2    *Kirksey v. Credit One Bank* (JAMS Arbitration); *Angelica Korchmaros v. Credit One*

3    *Bank* (JAMS Arbitration); *Yaroslav Kut v. Credit One Bank* (JAMS Arbitration); *Brad*

4    *Larsen v. Credit One Bank* (JAMS Arbitration); *Sarah Lawhead v. Credit One Bank*

5    (JAMS Arbitration); *Gary Lawrence v. Credit One Bank* (JAMS Arbitration); *Timothy*

6    *Levis Johnson v. Credit One Bank* (JAMS Arbitration); *Kemisha Levy v. Credit One*

7    *Bank* (JAMS Arbitration); *Benjamin Lewis v. Credit One Bank* (JAMS Arbitration);

8    *Jackie Likovic v. Credit One Bank* (JAMS Arbitration); *Lorenzo Lockwood v. Credit*

9    *One Bank* (JAMS Arbitration); *Cathy Loreto v. Credit One Bank* (JAMS Arbitration);

10    *Dawn Lowery v. Credit One Bank* (JAMS Arbitration); *Issac Lowery v. Credit One*

11    *Bank* (JAMS Arbitration); *Leslie Malina v. Credit One Bank* (JAMS Arbitration); *Torre*

12    *Mason v. Credit One Bank* (JAMS Arbitration); *Michael McDevitt v. Credit One Bank*

13    (JAMS Arbitration); *Maya Christian McKeever v. Credit One Bank* (JAMS

14    Arbitration); *Linda McNeal v. Credit One Bank* (JAMS Arbitration); *Amanda McNeill*

15    *v. Credit One Bank* (JAMS Arbitration); *James McPartland v. Credit One Bank* (JAMS

16    Arbitration); *Janice Metzger v. Credit One Bank* (JAMS Arbitration); *Dawn and*

17    *Anthony Mighaccio v. Credit One Bank* (JAMS Arbitration); *Adriane Miles v. Credit*

18    *One Bank* (JAMS Arbitration); *Keith Miller v. Credit One Bank* (JAMS Arbitration);

19    *Dixie Dawn Moore v. Credit One Bank* (JAMS Arbitration); *Sabrina Moore v. Credit*

20    *One Bank* (JAMS Arbitration); *Estefany Morel v. Credit One Bank* (JAMS Arbitration);

21    *Juan Moreno v. Credit One Bank* (JAMS Arbitration); *Michelle Morgan v. Credit One*

22    *Bank* (JAMS Arbitration); *Darlene Morrison v. Credit One Bank* (JAMS Arbitration);

23    *Bobbie Murray and Random Booth v. Credit One Bank* (JAMS Arbitration); *Charlene*

24    *Myers v. Credit One Bank* (JAMS Arbitration); *Denise Myers v. Credit One Bank*

25    (JAMS Arbitration); *Rebecca Naylor v. Credit One Bank* (JAMS Arbitration); *Sharon*

26    *Neville v. Credit One Bank* (JAMS Arbitration); *Jessanna Nunnery (Mitchell) v. Credit*

27    *One Bank* (JAMS Arbitration); *Anthony Ogline v. Credit One Bank, N.A. and Midland*

28    *Funding, LLC* (JAMS Arbitration); *Agnes Ousley v. Credit One Bank* (JAMS

Arbitration); *Kaitlyn Peace v. Credit One Bank* (JAMS Arbitration); *Thomas Piner v. Credit One Bank* (JAMS Arbitration); *Melissa Prieto v. Credit One Bank* (JAMS Arbitration); *Heather Pyle v. Credit One Bank* (JAMS Arbitration); *Nathan Quick v. Credit One Bank* (JAMS Arbitration); *Nikola Radojkovic v. Credit One Bank* (JAMS Arbitration); *Jessica Rainey v. Credit One Bank* (JAMS Arbitration); *Tyrone Randolph v. Credit One Bank* (JAMS Arbitration); *Derek Reid v. Credit One Bank* (JAMS Arbitration); *John Reyes v. Credit One Bank* (JAMS Arbitration); *Rich Richardson v. Credit One Bank* (JAMS Arbitration); *Deborah Ristoff v. Credit One Bank* (JAMS Arbitration); *David Robertson v. Credit One Bank* (JAMS Arbitration); *Heather Robertson v. Credit One Bank* (JAMS Arbitration); *Ryan Romero v. Credit One Bank* (JAMS Arbitration); *Kathy Rupp v. Credit One Bank* (JAMS Arbitration); *Camilla Sammons v. Credit One Bank* (JAMS Arbitration); *Paul Schaferling v. Credit One Bank* (JAMS Arbitration); *Christopher Shirley v. Credit One Bank* (JAMS Arbitration); *Jerryd Shoda v. Credit One Bank* (JAMS Arbitration); *Martha Gabriela Silva Canales v. Credit One Bank* (JAMS Arbitration); *Jay Simon v. Credit One Bank* (JAMS Arbitration); *Melissa Simpson v. Credit One Bank* (JAMS Arbitration); *Delisa Sims v. Credit One Bank* (JAMS Arbitration); *Gween Sims v. Credit One Bank* (JAMS Arbitration); *Bridgette Fretz v. Credit One Bank* (JAMS Arbitration); *Christine Sokoloski v. Credit One Bank* (JAMS Arbitration); *Kyle Sorensen v. Credit One Bank* (JAMS Arbitration); *Paula Spivey v. Credit One Bank* (JAMS Arbitration); *Joshua Stack v. Credit One Bank* (JAMS Arbitration); *Anturuan Stallworth v. Credit One Bank* (JAMS Arbitration); *Rebecca Stanley v. Credit One Bank* (JAMS Arbitration); *Alisha Stewart v. Credit One Bank* (JAMS Arbitration); *Helen Stuber v. Credit One Bank* (JAMS Arbitration); *Pamela Swanson v. Credit One Bank* (JAMS Arbitration); *Shannon Taylor v. Credit One Bank* (JAMS Arbitration); *Angie Teneyck v. Credit One Bank* (JAMS Arbitration); *Stephanie Thornton v. Credit One Bank* (JAMS Arbitration); *Connie Tolbert v. Credit One Bank* (JAMS Arbitration); *Tamara Tuggle v. Credit One Bank* (JAMS Arbitration); *Leo Underhill v. Credit One Bank* (JAMS Arbitration);

*Megan Veraldi v. Credit One Bank* (JAMS Arbitration); *Samantha Walters v. Credit One Bank* (JAMS Arbitration); *Brenda Walton v. Credit One Bank* (JAMS Arbitration); *Thomas Watson v. Credit One Bank* (JAMS Arbitration); *Anita Welch v. Credit One Bank* (JAMS Arbitration); *Trisha West v. Credit One Bank* (JAMS Arbitration); *Jill Williams v. Credit One Bank* (JAMS Arbitration); *Marie Wills v. Credit One Bank* (JAMS Arbitration); *Joy Wilson v. Credit One Bank* (JAMS Arbitration); *Christy Wineinger v. Credit One Bank* (JAMS Arbitration); *Sean Woodburn v. Credit One Bank* (JAMS Arbitration); *Michelle Robertson v Navient Solutions, Inc*., Case No.: 8:17-cv-01077-RAL-MAP (M.D. Flordia Tampa).

### *Work and Analysis in this Case*

13.    I have reviewed various documents and evidence from this case relating to the calls made to Plaintiff, and I have reviewed various other documents relating to the use and regulation of autodialers. Specifically, I have reviewed the following documents: 1) Exhibit B - FCC 2003 Order (*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C. Red. 14014); 2) Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; 3) Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2; 4) Exhibit E - US patent 3943289; 5) Exhibit F - US patent 4933964; 6) Exhibit G - Noble TCPA Compliance Solution; 7) Exhibit H - ATDS and predictive dialers 1970-1992; 8) Exhibit I - Davox Marketing; 9) Exhibit J - US Patent 3229042; 10) Exhibit K - US Patent 3317678; 11) Exhibit L - Charles Messer Amicus Brief; 12) Exhibit M - FCC response to ACA; 13) Exhibit N - 1992 FCC Order; 14) Exhibit O – FCC 2012 Order; 15) Exhibit P - Wash Times 1991; 16) Exhibit Q – FCC 2008 Order; 17) Exhibit R - Dialer_Manager_Help; 18) Exhibit S - 1992 comments to FCC; 19) Exhibit T - Aspect Unified IP PredictiveDialing DS; 20) Exhibit U - UIP66SP2 Base Install Guide; 21) Exhibit V - UIP66SP2 Security Guide; 22) Exhibit W - UIP66SP2 Troubleshooting Guide; 23)

Exhibit X - UIP66SP2 release notes; 24) Exhibit Y - Aspect Troubleshooting_gd; 25) Exhibit Z - UIP66SP2 Planning Guide; 26) Exhibit BA - ALM72 Data Model Guide; 27) Exhibit BB - ALM72 System Administrator Guide; 28) Exhibit BC - Customer Care Center Outbound Contact Strategy document.

14.    Additionally, I have analyzed the Aspect UIP predictive dialer in other matters numerous times over the last 10 years.

15.    Based upon the documents and evidence I have reviewed, and my experience and knowledge of the Aspect UIP predictive dialer used by Ocwen, I conclude that Ocwen used a predictive dialer, a type of automatic telephone dialing system, to place calls to the Plaintiff.

## *Ocwen used a Predictive Dialer, which has the Characteristics of an Automatic Telephone Dialing System*

16.    I have been retained in part to evaluate whether the telephone dialing systems used by Ocwen to place the calls at issue in this case was a predictive dialer or otherwise has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227. ("TCPA"). According to the FCC:

> "The TCPA defines an 'automatic telephone dialing system' as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have 'the *capacity* to store or produce telephone numbers (emphasis added)'...."

*(See Exhibit B – In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Red. 14014, at ¶ 131-134 (2003) (the "FCC 2003 Order")).*

17.     Within the industry, "Automatic Telephone Dialing System", or "auto-dialer" for short, has been attributed to any system with the capacity to automatically dial phone numbers.  Naturally, for a system to automatically dial phone numbers, the system must either produce or store those phone numbers.  Within the industry, these terms were not applied to systems that would only call one pre-programed number such as a home security system or speed dial, but were applied to systems used for telemarketing or call centers.  These names have been attributed to these systems for over 50 years.  There are different types of "auto-dialers" such as "predictive dialers," "power dialers," and dialers that deliver pre-recorded messages (commonly referred to as "voice broadcasting").  Within the industry, these systems are not defined by any other terms when used in other dialing modes such as manual or preview.  The fact that these terms have been used to define auto-dialers for over 50 years can be corroborated or discovered by a few clicks through the Patent Office's website (new patents cite old patents) which yields these historical insights.  The FCC's understanding seems to be consistent with the industry's understanding.  (*See Exhibit B – FCC 2003 Order, at ¶¶ 131-134 (finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system"); Exhibit O – FCC 2012 Order footnote 12, ¶ 20; Exhibit M - FCC response to ACA page 57 of 110; Exhibit N - FCC 2012 Order ¶¶8-9).* Within the industry, autodialers only need to store or produce numbers and call them to be an ATDS.  In this case, the predictive dialing system used by Ocwen is capable of doing both.  Because the terms used within the industry are the same as the terms used by the FCC and the TCPA, to clarify my use of the terms in my report, I will point out that when referring to the FCC's or TCPA's definition I will clarify, as I did in the previous paragraph, by stating, "characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act."  Otherwise, when I use these terms, I am using them in the context which they have been used for decades within the industry.

13

18.     The term "Predictive dialer" is a technical term used to describe the type of dialing system.  Predictive dialers all work under the same guiding principle: they transfer telephone numbers to be called to a list or "campaign."[1]  This list of numbers is then dialed without human intervention. The calls are made, using multiple telephone lines, in advance of being connected to a live operator.  Using a complex computer algorithm, the dialing system will "predict" how far in advance to make the calls in attempt to prevent time wasted in listening to rings, answering machines, disconnected phone numbers, and calls that are not answered.  This functionality has not changed since Davox marketed their predictive dialers in the 1980's. (*See Exhibit I – Davox Marketing*).

19.     The term "Predictive dialer" was not created by the FCC in their 2003 Order or their 1992 Order.  Nor was the term "automatic telephone dialing system" created by Congress.  These are terms that have been used to describe such equipment, by those in the industry for decades.  Norman A. Sheldon filed a patent (*Exhibit E – US patent 3,943,289*) on July 12, 1974 for what he called a "automatic telephone dialing system" (*Exhibit E – US patent 3,943,289 page 4 column 2 line 63*) which dialed numbers from a sequential number generator and delivered pre-recorded messages to telephone subscribers. He chose to use a sequential number generator because at that time computer storage was very expensive (*Exhibit E – US patent 3,943,289 page 4 column 2 lines 2-11*).  Although he chose to use a sequential number generator, stored lists of numbers had been used for many years prior to his patent. (*See Exhibit J – US Patent 3229042; Exhibit K – US Patent 3317678*).  In July 25, 1989, Bassem M. Girgis filed a patent (*Exhibit F - US patent 4,933,964*) for a "predictive outbound dialing system" (*Exhibit F - US patent 4,933,964 page 19 column 2 line 53*) which used an "input call list" (*Exhibit F - US patent 4,933,964 figure 3*) stored in the system to call those numbers in advance predicting when a live agent would be available using a

---

[1]     A "campaign" is like a "pool" in that it is calling a list of phone numbers organized by some predefined criteria for a specific purpose.  Further, "pool" and "campaign" as used throughout this Report have the same meaning.

predictive algorithm.  This system was designed to call out on more lines than available agents from a list of numbers, listen for rings, busy, and answered calls, and connect the calls to agents by predicting when they would be available.  This is the precise capability of the Predictive dialers used today and the predictive dialer used by Ocwen. The functionality of the autodialers and predictive dialers has not changed since long before the TCPA until now with the exception that modern dialers can make more calls in a shorter period of time.  Attached as Exhibit H are examples of articles and job postings illustrating that the exact same type of equipment was used over the last four decades, along with the terms "Automatic Telephone Dialing System" and "Predictive Dialer," long before Congress or the FCC considered the equipment.  (*See Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit M – FCC response to ACA, at pp. 13-14 footnote 3*).  The equipment described in the TCPA, the FCC 2003 Order and the 1992 FCC Order have precisely the same characteristics as the equipment that is in use today and used by Ocwen.

20.     The fact that the dialer places calls to numbers stored by the dialing system and delivers predictive dialed calls indicates that the dialer has the characteristics of an ATDS, as it relates to predictive dialers, as clarified in the FCC 2003 Order:

> The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.  As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.   The principal feature of predictive dialing software is a timing function, not number storage or generation. ...[T]hese machines are not conceptually different from dialing machines without the predictive computer program attached.
>
> ….

---

1

2    The TCPA defines an "automatic telephone dialing system" as "equipment

3    which has the capacity (A) to store or produce telephone numbers to be

4    called, using a random or sequential number generator; and (B) to dial such

5    numbers." The statutory definition contemplates autodialing equipment that

6    either stores or produces numbers. It also provides that, in order to be

7    considered an "automatic telephone dialing system," the equipment need

8    only have the "capacity to store or produce telephone numbers (emphasis

9    added). . .." It is clear from the statutory language and the legislative history

10   that Congress anticipated that the FCC, under its TCPA rulemaking

11   authority, might need to consider changes in technologies. In the past,

12   telemarketers may have used dialing equipment to create and dial 10-digit

13   telephone numbers arbitrarily. As one commenter points out, the evolution of

14   the teleservices industry has progressed to the point where using lists of

15   numbers is far more cost effective. The basic function of such equipment,

     however, has not changed—the capacity to dial numbers without human

16   intervention. We fully expect automated dialing technology to continue to

17   develop.

18   ….

19   [T]o exclude from these restrictions equipment that use predictive dialing

20   software from the definition of 'automated telephone dialing equipment'

21   simply because it relies on a given set of numbers would lead to an

22   unintended result. ...We believe the purpose of the requirement that

23   equipment have the 'capacity to store or produce telephone numbers to be

24   called' is to ensure that the prohibition on autodialed calls not be

25   circumvented. Therefore, the Commission finds that a predictive dialer falls

     within the meaning and statutory definition of 'automatic telephone dialing

26   equipment' and the intent of Congress.

27   (*Exhibit B – FCC* 2003 Order, at *¶¶ 131-134 (finding that a predictive dialer falls*

28   *within the TCPA's definition of "automatic telephone dialing system").*)

---

16

21.     Additionally, the properties of the dialing system has the precise capabilities of an ATDS as further clarified by FCC Order 12-56 (May 21, 2012), wherein, the FCC stated:

> Under the TCPA, the term "automatic telephone dialing system" is defined as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists.

(*See Exhibit O – FCC 2012 Order ¶ 20 and footnote 12*).

22.     Based upon the documents and evidence I have reviewed and my knowledge of the Aspect UIP predictive dialer, the calls that Ocwen made to Plaintiff were made using a predictive dialer.  As explained further below, in my expert opinion, the below dialing system that is discussed in detail has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the TCPA.

23.     The Aspect Unified IP predictive dialer was used by Ocwen or its dialer vendors.  The Aspect UIP dialer is a predictive dialer that, like other predictive dialers, calls lists of numbers organized as "campaigns." The Aspect Unified IP predictive dialer can be used to make predictive dialed calls along with delivering pre-recorded messages by automatically calling a list of numbers and playing an audio file.  (*See Exhibit Y - Aspect Troubleshooting_gd pp. 13-15; Exhibit T - Aspect Unified IP PredictiveDialing DS; Exhibit U - UIP66SP2 Base Install Guide pp. 96, 137; Exhibit Z - UIP66SP2 Planning Guide pp. 11-22; Exhibit V - UIP66SP2 Security Guide p. 7; Exhibit W - UIP66SP2 Troubleshooting Guide pp. 23-26, 242; Exhibit X - UIP66SP2 release notes p. 3; Exhibit BA - ALM72 Data Model Guide Bates Numbers KEYES_01083, KEYES_01085; Exhibit BB - ALM72 System Administrator Guide Bates Numbers*

*KEYES_01563, 01584, 01587, 01811; Exhibit BC - Customer Care Center Outbound Contact Strategy document Bates Numbers KEYES_00974-00980, KEYES_00994, KEYES_00995).* The Aspect UIP predictive dialer is capable of dialing a list of numbers loaded into a "campaign" or "pool" on the dialer. The Aspect UIP predictive dialer then can automatically dial those numbers and deliver predictive dialed calls or agent-less calls delivering pre-recorded messages. (*Id.*) For predictive dialed calls, the Aspece UIP predictive dialer will call using multiple telephone lines per agent, and it will use all available telephone lines when making agent-less calls. (*Id.*) All phone calls, regardless of how dialed, are called using the same equipment, terminals, phone, PBX, and Aspect UIP predictive dialer before going to the PSTN (public switched telephone network). (*Id.*)

24.    After reviewing the above documents, and based on my experience with predictive dialers and autodialers, I am of the opinion that Ocwen used the above predictive dialer to place telephone calls to Plaintiff, and that the dialer has the capacity to store or produce numbers to be called, using a random or sequential number generator, and the capacity to call such numbers. Specifically, the dialers are capable of automatically and without human intervention calling numbers that are stored as a list, which itself is stored in a table of a database.

25.    Thus, in my expert opinion, the dialing system (as outlined above) has the characteristics of an ATDS as contemplated by the TCPA and clarified by the FCC, because this systems has the capacity to store numbers in a list and dial them without human intervention and also has the capacity to generate numbers to form a list for dialing without human intervention.

26.    A predictive dialer has the capacity of an ATDS, not because it predicatively dials calls, but simply because it has the capacity to automatically call numbers stored in a list. The predictive algorithm in a predictive dialer predicts when agents would be available and is no way related to the storage or production of numbers. With all the predictive dialers that I have worked with in the last 18 years, the

18

1   predictive algorithm was in no way related to the storage or production of numbers. The
2   FCC correctly stated this, "The principal feature of predictive dialing software is a
3   timing function, not number storage or generation." (*See Exhibit B – FCC 2003 Order*
4   *at ¶ 131*)

5       27.   All predictive dialers have the characteristics of an ATDS, but not all
6   ATDS's are predictive dialers.  As the FCC stated, "The principal feature of predictive
7   dialing software is a timing function, not number storage or generation.... [T]hese
8   machines are not conceptually different from dialing machines without the predictive
9   computer program attached." (*See Exhibit B – FCC 2003 Order at ¶ 131*).  The FCC
10  also has grouped dialers into two categories: those that have live agents (predictive
11  dialers) and those that are agent-less (pre-record, artificial voice).  (*See Exhibit N - 1992
12  FCC Order ¶¶ 8, 9*)  I myself use the example of predictive dialers when explaining
13  what capacities are in view in the FCC 2003 Order.  I do this because there are many
14  more features than just storing numbers in a list and automatically calling them, and
15  using the example of the predictive dialer I can highlight that none of those other
16  features have anything to do with computer storage or the generation of numbers.
17  Systems, such as the one listed above, used by Ocwen, that are capable of calling lists
18  of numbers to deliver a pre-recorded message or systems that call numbers to deliver a
19  text or SMS message have no live agents involved (Referred to as "Agent-less" calls by
20  those in the industry); therefore, there is little confusion on their capacity to store or
21  produce numbers and to call them. But all those other features in a predictive dialer are
22  in addition to storing numbers and automatically calling them.  Other features found in
23  predictive dialers—such as ACD routing, AMD detection, preview mode and other
24  dialing modes, predictive algorithms, abandon rate, cloud based, skills based routing,
25  blended campaigns, CRM integration, types of databases used by the system, VoIP,
26  POTS lines, T1 lines, PRI lines, operating systems, and computer hardware—all have
27  nothing to do with the system's capacity to store a list of numbers and to automatically
28  call them.  For these reasons, I use the example of predictive dialers to explain what

1   features make it an ATDS, because at the same time I can explain what features do not
2   make it an ATDS.  Even Interactive Intelligence refers to additional dialing modes as
3   supplemental features outside the basic functionality of the predictive dialer,
4   "Interaction Dialer's primary purpose is efficient placement of outbound calls.
5   Interaction Dialer is both an automated dialer and predictive dialer.  It supports
6   supplemental dialing modes for added flexibility." (*See Exhibit R -*
7   *Dialer_Manager_Help pp. 416-420*)

8        28.    I would note that predictive dialers, including the Aspect UIP predictive
9   dialer generally have the capacity to deliver pre-recorded messages and agent-less IVR
10  campaigns to telephone consumers without the need of live agents.  (*See Exhibit T -*
11  *Aspect Unified IP PredictiveDialing DS;  Exhibit Z - UIP66SP2 Planning Guide p. 11;*
12  *Exhibit W - UIP66SP2 Troubleshooting Guide p. 242; Exhibit X - UIP66SP2 release*
13  *notes p. 3; Exhibit BA - ALM72 Data Model Guide Bates Numbers KEYES_01011,*
14  *KEYES_01013; Exhibit BB - ALM72 System Administrator Guide Bates Numbers*
15  *KEYES_01584,   KEYES_01586,   KEYES_01591,   KEYES_01595,   KEYES_01697,*
16  *KEYES_01701, KEYES_01828, KEYES_01829, KEYES_01830; Exhibit BC - Customer*
17  *Care Center Outbound Contact Strategy document Bates Numbers KEYES_00994,*
18  *KEYES_00995*).

19       29.    The dialer's mode of operation however does not change the capacity of
20  the system.  Changing the mode of dialing is done by effectively clicking a radio button
21  and clicking "save."  (*See Exhibit BC - Customer Care Center Outbound Contact*
22  *Strategy document Bates Numbers KEYES_00994, KEYES_00995*)  The administrator
23  of a predictive dialer is not capable of taking away any functionality of the system.  The
24  administrator can only choose to not use it.  The fact that one campaign can be
25  configured to use preview mode and another campaign configured to use predictive,
26  while other agents place calls manually, all occurring at the same time, illustrates the
27  system has the current capacity regardless of the dialing mode selected for a particular
28  campaign.

30.    Most predictive dialers, which I have seen, also employ a "manual" mode and a "preview" mode, which presents the calling agent with information about the to-be-called party before the number is actually dialed. The agent then has the ability to accept that lead based on the information presented, or reject it and await the dialer to present a new lead to be called. Because a dialer has a preview mode or a manual mode and the calling party may have used those modes, however, does not mean that the dialer fails to qualify as an ATDS.  Those other dialing modes outside of predictive are only supplemental dialing modes within the same system.  (*See Exhibit R - Dialer_Manager_Help pp. 416-420*)

31.    I am not alone in my understanding of whether manual mode has any effect on the capacity of the predictive dialer.  Recently, Ontario Systems (the creators of the popular Guaranteed Contacts predictive dialer and the FACS system) published a two-part article on the subject of dialing modes and their impact on the predictive dialer's capacity as defined by the FCC.  Using the example of manually dialed calls through the predictive dialer, Ontario Systems highlights that a Predictive dialer is a predictive dialer regardless how it is used.  Manual dialing occurs when one presses all ten digits of the phone number to place the call, not a number stored on the list. Preview mode calls the numbers from the list stored in the predictive dialer's database. The FCC clarified that predictive dialers are an ATDS because of their capacity, not how the operator uses it.  The industry has attributed the name "predictive dialer" to these systems regardless of how they are used.  The two articles from Ontario Systems are relevant in their entirety (*See Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*), however, the summary highlights the main point:

In other words, if the technology you use to contact consumers has any capacity to dial predictively, or pull from a database of numbers and dial them, current judicial opinion indicates it is an autodialer.  Period. This is true whether you launch the call manually by pressing a field, or if you enter 10 digits on a keypad.  On the other hand, it opined such a call is a manual

21

dial if it's made using a system to contact consumers that is not tied, routed from or to, or in any way connected to your autodialer. If it's not, it is unlikely you are contacting consumers using an automatic telephone dialing system as defined by the FCC.

(*Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*).  In other words, to call cell phones, one should use a separate PBX entirely (plain phone system).

32.    Another manufacturer of a popular predictive dialer agrees.  Noble Systems offers a solution which routes calls to wireless numbers through a separate PBX entirely. *(See Exhibit G - Noble TCPA Compliance Solution*).  There is no indication however that Ocwen had such a solution in place for the calls at issue in this matter.  On the contrary, Ocwen used the Aspect UIP predictive dialer.

33.    As stated above, the FCC relies upon the following definition of an "automatic telephone dialing system":

> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have "the capacity to store or produce telephone numbers (emphasis added)...."

(*See Exhibit B – FCC 2003 Order at ¶ 132*).  This definition is consistent with the definition used by those in the industry long before adopted by Congress or the FCC. (*See Exhibit E - US patent 3,943,289; Exhibit F - US patent 4,933,964; Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit I - Davox Marketing; Exhibit J - US Patent 3229042; Exhibit K - US Patent 3317678*).

34.    I would point out that making a computer generate a list of 10 digit numbers "out of thin air", is a relatively trivial task.  All computers can generate random or sequential numbers.  A computer system simply cannot operate without the

22

ability to do so.  A "pseudo random number generator" is a key element in allowing a computer to "compute."  Computers are designed to do math and counting i.e. "to compute."  For example, typing "seq 6192486000 6192486999 > sequential_numbers_to_call.txt" creates a list of 1000 Sprint Wireless Numbers to be called (this was done on my regular laptop with no additional software installed).  In other words, my laptop running Linux has natively installed a "sequential number generator" that can produce a list of phone numbers.  Windows computers have a similar command line function as well.  Typing "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.txt" generates the same list on a Windows computer.

35.    The Aspect UIP Telephony Adapter runs on Linux, Aspect ALM runs on Linux and the Aspect UIP software runs on Microsoft Windows. (*See Exhibit U - UIP66SP2 Base Install Guide pp. 17-55, 95-118; Exhibit Z - UIP66SP2 Planning Guide p. 33*).  The client would consist of an operating system, either Windows or Linux, and therefor contains both a random and sequential number generator.  Of course, storage of numbers does not discriminate on how the numbers were produced as computer storage can store any kind of data regardless of how it was produced whether loaded from a list of known numbers or a list of sequentially generated numbers. (*See Exhibit M – FCC Response to ACA. at. 6, 12, 13, 24, 36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 52*).

36.    I would note that the industry has classified any system capable of auto-dialing phone numbers as an auto-dialer whether the numbers are stored **or** produced.  Also, for systems to produce numbers, those numbers still need to be stored before dialing them. (*See Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit I - Davox Marketing; Exhibit S - 1992 comments to FCC*)

37.    Within the industry, human activity (or lack of) does not define the equipment as an autodialer just as using a wrench as a hammer does not actually change the wrench to a hammer; it still remains a wrench.  Regardless of the mode of dialing, it does not change the fact that the dialer is a predictive dialer capable of making calls in

predictive mode.  Interactive Intelligence, a popular predictive dialer vendor, is not shy about highlighting the primary functionality of a predictive dialer is that of a predictive dialer, "Interaction Dialer's primary purpose is efficient placement of outbound calls. Interaction Dialer is both an automated dialer and predictive dialer.  It supports supplemental dialing modes for added flexibility." (*See Exhibit R - Dialer_Manager_Help pp. 416-420*) As illustrated in my steps taken (shown in the following section), my methods are consistent with those of the industry.  (*See Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2; Exhibit G - Noble TCPA Compliance Solution; Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit I - Davox Marketing*)  My understanding is also consistent with the understanding preceding the TCPA as illustrated by the history I provided of autodialers and predictive dialers.  My understanding in consistant with the telemarketers and debt collectors who submitted comments to the FCC regarding the TCPA in 1992 and also the 1992 FCC Order (*See Exhibit S - 1992 comments to FCC; Exhibit N - 1992 FCC Order ¶¶8-9*).  My understanding is Consistent with one TCPA defense counsel's expert (*See Exhibit L - Charles Messer Amicus Brief pp. 12-16*)  Additionally, while I was setting up autodialers and predictive dialers before 2003, I had no doubt that my predictive dialers where autodialers regardless of the dialing mode they were using.

38.    The FCC's orders and rulings provide me with the information that assists me in forming an opinion about whether Ocwen's dialing system has the characteristics of an ATDS. Based on those orders and rulings, based upon my review of the documents and evidence provided in this case, based on my knowledge of computer storage and computer processing, and based on my knowledge of autodialers and predictive dialers, it is also my expert opinion that the calls placed by Ocwen to Plaintiff using the dialer described in detail above were made using a predictive dialer that has the characteristics of an automatic telephone dialing systems as defined by the TCPA and FCC.

### *Additional steps taken in Analyzing Ocwen's Dialing System*

39.    To analyze the system, the first step was to identify the components of the system.  All the individual components of the system by themselves are incapable of performing any specific task.  For example, predictive dialing software needs to be installed on an operating system such as Microsoft Windows or Linux.  The operating system is required to be installed before any other programs such as the predictive dialing software.  The operating system also is what would allow programs, such as the dialing software, to interact with the hardware of the system (standard computer hardware).  To illustrate, no single component of an automobile is capable of transporting someone from point A to point B, but instead many components are combined to create a single system.  The automobile needs a chassis, akin to the operating system of a dialer.  The automobile also needs an engine, akin to the dialing software.  Typically, software is not created to perform a task that is handled by the operating system in which the software is installed on, such as the generation of phone numbers discussed earlier in my report.  To do so would be redundant, as would be having two radios in the automobile.  In the case of the Aspect UIP predictive dialer, the Aspect UIP Telephony Adapter runs on Linux, Aspect ALM runs on Linux and the Aspect UIP software runs on Microsoft Windows. (*See Exhibit U - UIP66SP2 Base Install Guide pp. 17-55, 95-118; Exhibit Z - UIP66SP2 Planning Guide p. 33*).  Earlier in my report, I provided the exact command to generate a list of numbers from either the server hosting the dialer software or the client the operator of the dialer sits at.  Lists are loaded from the client to the dialer, settings to campaigns are made from the client computer.  This "Client-Server" relationship is the same as the mainframe-terminal relationship seen in computer systems in the past.  This "Client-Server" relationship is often referred to as a "Distributed Application Structure" because it partitions tasks or workloads over a resource or service much the same way that each component of an automobile is responsible for a particular function in the overall system.  This distributed application model has also been referred to as "Software as a Service"

25

("SaaS") with web based applications combined with the client computer connecting to the web server.  The FCC highlights that the system is comprised of components in their 2003 order "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." (*See Exhibit B – FCC 2003 Order, at ¶ 131*)

40.    I would note that predictive dialers were intended to primarily call from a defined list of numbers since the time they became popular in the mid 1970's.  On a technical level, while one could generate and call a list of sequential numbers, it would confuse the algorithm and the dialer would generate many abandoned calls.  As I illustrated earlier, "predictive dialers," and "autodialers" were common parlance within the telemarketing and debt collection industries, but also well understood outside those industries two decades later when the TCPA was enacted. (*See Exhibit M - FCC response to ACA pp. 13-14 footnote 3; Exhibit P - Wash Times 1991; Exhibit N - 1992 FCC Order ¶¶ 8-9; Exhibit S - 1992 comments to FCC; Exhibit I - Davox Marketing; Exhibit L - Charles Messer Amicus Brief pp. 12-16*).  As stated earlier in my report, predictive dialers functionality has not changed since Davox marketed their predictive dialers throughout the 1980's.

41.    Finally, in my analysis, the mode of operation does not change the capabilities of the system.  As I pointed out earlier, a predictive dialer can easily be instructed to make auto-dialed calls or to make preview dialed calls with a couple clicks of the mouse.  My analysis was to determine if the system was an "auto-dialer."   Even when the dialer is not placing calls, it is still an auto-dialer, and within the industry there is no other name attributed to such systems when used in other modes or whether the dialer calls from a defined list or generated list. (*Also see Exhibit Q – FCC 2008 Order ¶¶ 12-14*)  On the contrary, the industry views those dialing modes as "supplemental

dialing modes" not something that changes the dialer into something else as highlighted by Interactive Intelligence, "…both an automated dialer and predictive dialer.  It supports supplemental dialing modes for added flexibility." (*See Exhibit R - Dialer_Manager_Help pp. 416-420*)

42.    I would point out that predictive dialers have been included in the definition of an ATDS by the telemarketing and debt collection industry for five decades with or without the ability to generate numbers, and the FCC has specifically included predictive dialers as an ATDS since 1992. (*See Exhibit N - 1992 FCC Order ¶¶ 8,9; Exhibit B – FCC 2003 Order, at ¶¶ 131-134; Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit I - Davox Marketing; Exhibit S - 1992 comments to FCC*)

43.    I reserve the right to amend, modify or supplement the statements and opinions set forth herein as appropriate.

44.    I declare that the foregoing is true and correct, subject to the laws of perjury of the United States. Executed in Spring Valley, CA on this ____ day of April 2018.

_____

Jeffrey A. Hansen

27